UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAFAEL GARCIA FLORES,<br><br>                    Petitioner,<br>v.<br><br>MICHAEL SMELOSKY, Warden,<br><br>                    Respondent. | Case No. 08cv1086-BEN (BLM)<br><br>**REPORT AND RECOMMENDATION FOR ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

This Report and Recommendation is submitted to United States District Judge Roger T. Benitez pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.

On June 18, 2008, Petitioner Rafael Garcia Flores, a state prisoner who is proceeding *pro se*, commenced these habeas corpus proceedings pursuant to 28 U.S.C. § 2254. Doc. No. 1. Petitioner challenges his convictions and sentence.

This Court has considered the Petition, Respondent's Answer, Petitioner's Traverse and all supporting documents submitted by the parties. For the reasons set forth below, this Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

///

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.    Petitioner's Conviction and Sentence**

The following facts are taken from the California Court of Appeal's opinion on direct review in <u>People v. Rafael G. Flores</u>, No. D048488, slip op. (Cal. Ct. App. October 19, 2007). <u>See</u> Lodgment 6. This Court presumes the state court's factual determinations to be correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003); <u>see also</u> <u>Parke v. Raley</u>, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).

FACTUAL AND PROCEDURAL BACKGROUND

Flores was arrested March 21, 2005, and charged in two separate complaints for charges arising from evading police officers with reckless driving on January 16 and February 14, 2005, respectively. After the trial court granted the prosecutor's motion for joinder of the two cases, the matter proceeded to jury trial. Because Flores does not challenge the sufficiency of the evidence to support his convictions, we merely set forth the evidence presented at trial as to each incident for purposes of our discussion of Flores's contentions on appeal.

*The January 16, 2005 Incident*

Just after midnight on January 16, 2005, as National City Police Officer Leiderson Zeferino pulled behind a white Honda Accord stopped at a light at an intersection in National City, the driver of the Honda, who appeared to be a male with short hair or a shaved head, accelerated through the red light. Zeferino activated his siren and red and blue lights and gave chase, advising dispatch he was pursuing the Honda. The lone occupant of the Honda led Zeferino on a six-mile high-speed chase during which he ran at least 10 stop signs, violated the speed limit in residential neighborhoods, failed to yield for cross-traffic and narrowly missed a pedestrian crossing one intersection.

Although Zeferino lost sight of the Honda when it entered an alley, another National City police officer on patrol, Michael Clement, found the Honda abandoned at 40th and Hemlock in San Diego shortly after hearing the pursuit broadcast that Zeferino had lost the car. When found, the

Honda's engine was running and its keys were in the ignition. In a search of the Honda, Clement found Flores's California identification card on the floorboard of the driver's side of the car and a loaded revolver between the driver's seat and the door.[1]

The subsequent investigation revealed that the primary driver of the Honda, Gina Alonzo (aka Gina Ambriz), knew Flores by the nickname of "Silent,"[2] who had been to her home several times with a friend of hers and also with her cousin, Melissa Gomez.  Alonzo did not remember whether Flores had ever been in her car, and she had not given him permission to drive it on the night of January 14, 2005.  Alonzo discovered the Honda missing from her driveway the next morning and subsequently filed a police report on it being stolen. Alonzo did not own a revolver.

Forensic testing revealed a fingerprint belonging to Flores on the exterior of the driver's door of the car.  No prints were recovered from the revolver.

*The February 14, 2005 Incident*

Around midnight on February 14, 2005, as San Diego Police Officer John Howard, on patrol with his partner in Sherman Heights, was investigating a complaint of vehicle vandalism, Howard observed a black Lincoln Town car parked on 27th Street and Market Street with its engine running and decided to investigate.  As Howard drove by the car, he shined his spotlight on its inside compartment to view the two male occupants, making eye contact with the driver who was Hispanic and wearing a beanie or old navy watch cap. When Howard then made a U-turn and pulled up behind the Lincoln, the driver took off down Market Street at a high rate of speed.  Howard activated his lights and siren and pursued the Lincoln, which continued to speed, run stop signs and lights as it led the officers on a 5.9 mile high-speed pursuit through city streets and local highways.

When Howard's brakes began to fail, San Diego Police Officer Cesar Castro took over the lead in pursuing the Lincoln.  He followed the Lincoln as it ran several more lights and stop signs and then onto the freeway where it crashed just past the Ocean View exit on Interstate 15.

---

[1]     A credit card in the name of Lynn Rennan was also found in the Honda. Although she testified at trial that her purse and credit card had been taken from her while she was shopping in January 2005, she could not identify Flores as the thief, but said he looked similar to the Hispanic male shown in the store surveillance video.  No charges had been filed against Flores concerning the theft of Brennan's credit card.

[2]     The parties stipulated that a San Diego Police detective had known Flores for 11 years and that during such time Flores also used the names of Ralph and Silent.

After seeing two men leave the car and run across the freeway, Castro saw a woman, who came out the driver's side door of the Lincoln, run past the center median of the freeway where she was hit by oncoming traffic. Hearing her screams for help, Castro dragged the severely injured woman out of the traffic lanes. Howard and his partner arrived on the scene to see the two males running across the traffic lanes. Howard stayed with Castro and the injured woman while Howard's partner ran, without success, after the men. Howard was certain that Flores was the driver of the Lincoln.[3]

California Highway Patrol Officer Eric Nicholas arrived at the scene of the accident and began an investigation. Based on the tire marks in the area, Nicholas opined that the Lincoln had driven across the median and hit the exit sign before careening out of control and striking the center divider wall as it came to rest on the freeway. Because the driver's seat was pushed back, Nicholas assumed the driver of the Lincoln was relatively tall. A latent fingerprint lifted from the fuel door of the Lincoln matched Flores's right index finger.

Several hours later, Nicholas spoke with 17-year-old Gomez, the woman who had been injured and taken to the hospital. Gomez was generally evasive and uncooperative when questioned about the accident, but did tell Nicholas, "Gabe was driving, okay?" When Nicholas spoke with Gomez at the hospital several weeks later, she refused to look at a photo lineup admonishment card and quickly looked away when shown a photo lineup, refusing to answer whether she recognized anyone. Gomez told Nicholas that she had met two guys at the Chula Vista mall a half hour before the accident and had agreed to go with them even though she had never seen them before and did not know their names. The patient sharing the room with Gomez identified Flores in the photo lineup as an extremely nervous man whom she had seen visiting Gomez.

Gomez's mother testified that Gomez had been getting regular telephone calls from a man named "Gabriel" in early 2005. When she visited Gomez in the hospital after the accident, she asked her if she had been with Gabriel, but Gomez would not answer her, saying, "Mom, you know already. Why do I have to answer it?" Gomez's mother later looked in Gomez's bedroom at home and found a strip of photographs showing Gomez with a man whom her mother assumed was Gabriel. Gomez's mother turned the photographs over to the police.

Gomez's mother continued to visit Gomez, who remained in the hospital for over three months during which time she had

---

[3]    Although Howard initially told investigating officers he was uncertain whether he would be able to identify the driver, he positively identified Flores's photograph in the photo lineup he was later shown.

17 to 22 surgeries and a rod placed in her left leg to prevent her from losing it.  On the evening of March 21, 2005, when Gomez's mother, along with her husband and son, paid a surprise visit to Gomez at the hospital, they found Flores, the man Gomez's mother knew as Gabriel from the strip photographs, lying next to Gomez on her hospital bed.  When Flores tried to run from the room, Gomez's mother and other family members subdued and detained him even though he had reached for a knife in his pocket.  Gomez's mother called hospital security and asked that the CHP be contacted "because [she] knew they were looking for him."  Flores was wearing a necklace with the name "Melissa" (Gomez's first name) on it when he was taken into custody.

Gomez's brother, who had been living at the family home with Gomez and their mother, identified Flores as Gomez's boyfriend in January 2005, whom he described as a tall Hispanic male in his 30's who drove a black Lincoln Town car when he picked up Gomez at the house.

Gomez reluctantly testified in the prosecution case.  She identified Flores as a man she knew by the name of "Ralph" and denied that she ever referred to him as Gabriel or Gabe.  She had met Flores through friends and her cousin Alonzo in December 2004.  Although he had called her almost every day in the beginning of 2005, and they had gone to the movies in the Lincoln and had kissed, Gomez was unable to "really say" that Flores was her boyfriend.  Gomez would not answer questions as to whether she had been intimate with Flores, saying, "Oh, I don't know" and "it's personal."

With regard to the driving incident and accident, Gomez claimed that after smoking some methamphetamine at home she had a friend drop her off at a party at her cousin's house near Logan Heights where she ran into Flores who was drunk and not paying attention to her.  Gomez borrowed the keys to the Lincoln, telling Flores she needed to get something from the car, and instead, to make Flores mad, left in the Lincoln with two bald-headed Hispanic men who were outside the house.  The taller of the two men, whom Gomez did not know, drove and agreed to take her home to National City.  She fell asleep as he drove around, but awoke when she heard sirens and saw flashing lights and realized the were being chased by the police.  When the driver hit a freeway sign and crashed into the center divider, Gomez got out of the car to run after the two men but was hit trying to cross the freeway.  Someone dragged her to safety and she was taken to the hospital.

Gomez could only remember parts of what happened at the hospital because she was on medication.  She denied telling CHP Officer Nicholas that Flores had been driving the Lincoln when it crashed, did not recall rooming with the woman who identified Flores as visiting her at the hospital, and did not identify Flores in the photographic lineup.  Although she had received letters from Flores since he was taken into

1     custody, Gomez denied he had told her what to say in court.

2     After the court advised the jury that it was going to permit some questions for the limited purposes of credibility, which were not directly related to the charges, Gomez denied that she had any feelings left for Flores at the time of trial. Although Gomez had learned that she was pregnant at the time she was hit by the car after the Lincoln crashed, she denied she lost the baby at that time.

6     On cross-examination, Gomez testified that she and Flores had gone with her cousin Alonzo in the Honda to a casino in December 2004. Gomez also claimed she had a boyfriend in custody at George Bailey and that she had lost her baby due to treatment for her leg.

9     As to both evading incidents, the parties stipulated that Flores had been convicted of a prior felony on February 10, 1995 in a San Diego Superior Court case.

11   *Defense Case*

12     Flores presented an expert in his defense, who testified on the process of acquiring information affecting eyewitness identification and explaining pertinent factors that affect the accuracy in such identification. The expert also discussed the problems with photographic lineups and opined the one used in this case did not fairly match up with (sic) Flores's photo with others so that his photo would more probably be picked out as the suspect.

17  Lodgment 6 at 4-11.

18     On December 16, 2005, a jury convicted Petitioner of (1) evading an officer with reckless driving on two different occasions, (2) hit and run driving, (3) possession of a firearm by a felon, (4) carrying a concealed firearm in a vehicle by a felon, and (5) carrying a loaded firearm in a vehicle by a felon. Lodgment 1 at 202-07. Following denial of Petitioner's motion for a new trial, the trial court sentenced Petitioner to eleven years in state prison. Lodgment 2, vol. 4 at 717. Specifically, the trial court sentenced Petitioner to the upper term of three years on count 1 (evading an officer with reckless driving) and

08cv1086-BEN (BLM)

1  doubled it due to Petitioner's prior conviction.[4]   The court then

2  imposed the midterm sentence for counts 2 (possession of a firearm by

3  a felon), 3 (having a concealed firearm in a vehicle) and 5 (evading an

4  officer with reckless driving), doubled to 16 months each, and stayed

5  sentence on count 4 (carrying a loaded firearm by a felon). Id. at 716-

6  17; Lodgment 1 at 164.   Petitioner also received an additional one year

7  based on his prior felonies. Id.   The judge ordered that the sentences

8  run consecutively.   Lodgment 1 at 164.

9  **B.   Direct Appeal**

10      Petitioner appealed to the California Court of Appeal, Fourth

11  Appellate District, Division One, raising three claims for relief.

12  Lodgment 3.   After the parties had filed their briefing, the Court of

13  Appeal ordered supplemental briefing on several sentencing issues. See

14  Lodgments 9-13.   In a reasoned opinion dated October 19, 2007, the Court

15  of Appeal modified Petitioner's sentence, reducing his total term to

16  nine years and eight months, but otherwise affirmed the judgment.

17  Lodgment 6.

18      On November 16, 2007, Petitioner filed a petition for review in the

19  California Supreme Court [Lodgment 7], which that court denied without

20  citation of authority on January 7, 2008 [Lodgment 8].

21  **C.   Collateral Review**

22      Petitioner did not seek collateral review in the California state

23  courts.

24  ///

25

26  _____

27      [4]      The court opted to strike two strikes, leaving only one prior conviction,
    but the court imposed the upper term because it found Petitioner had presented no
    circumstances in mitigation and at least two circumstances in aggravation. Lodgment

28  2, vol. 4 at 712, 716.

**STANDARD OF REVIEW**

Title 28 of the United States Code, section 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

The Petition was filed after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Summary denials do constitute adjudications on the merits.  See Luna v. Cambra, 306 F.3d 954, 960 (9th Cir. 2002).  Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision.  Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).

A state court's decision is "contrary to" clearly established federal law if the state court: (1) "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law; or (2) "confronts facts that are materially indistinguishable from a

8

1   relevant Supreme Court precedent and arrives at a result opposite to
2   [the Supreme Court's]." <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000).
3       A state court's decision is an "unreasonable application" of
4   clearly established federal law where the state court "identifies the
5   correct governing legal principle from this Court's decisions but
6   unreasonably applies that principle to the facts of the prisoner's
7   case." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003). "[A] federal
8   habeas court may not issue a writ simply because the court concludes in
9   its independent judgment that the relevant state-court decision applied
10  clearly established federal law erroneously or incorrectly . . . .
11  Rather, that application must be *objectively unreasonable*." <u>Id.</u> at 75-
12  76 (emphasis added) (internal quotation marks and citations omitted).
13  Clearly established federal law "refers to the holdings, as opposed to
14  the dicta, of [the United States Supreme] Court's decisions." <u>Williams</u>,
15  529 U.S. at 412.
16      Finally, habeas relief is also available if the state court's
17  adjudication of a claim "resulted in a decision that was based on an
18  unreasonable determination of the facts in light of the evidence
19  presented in state court." 28 U.S.C. § 2254(d)(2). A state court's
20  decision will not be overturned on factual grounds unless this Court
21  finds that the state court's factual determinations were objectively
22  unreasonable in light of the evidence presented in the state court
23  proceeding. <u>See</u> <u>Miller-El</u>, 537 U.S. at 340; <u>see also</u> <u>Rice v. Collins</u>,
24  546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing
25  the record might disagree" does not render a decision objectively
26  unreasonable). This Court will presume that the state court's factual
27  findings are correct, and Petitioner may overcome that presumption only
28  by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

08cv1086-BEN (BLM)

**DISCUSSION**

The Petition itself does not list Petitioner's grounds for relief, instead directing the Court to an attached "Brief in Support of Petition" ("Pet'r Brief"). The Brief in Support of Petition appears to be a photocopy of Petitioner's petition to the California Supreme Court on direct review, which raises four grounds for relief, though the fourth relates only to the proper remedy, should the third claim be granted. For this reason, Respondent addresses only the first three grounds for relief. <u>See</u> Answer to Pet. and Mem. P. & A. Supp. Thereof ("Resp't Mem.") at 21 n. 2.

Because the California Supreme Court summarily denied the petition for review (<u>see</u> Lodgment 8), on federal habeas review this Court must "look through" to the last reasoned state court decision. <u>Ylst</u>, 501 U.S. at 801-06. Here, the California Court of Appeal rendered the last reasoned decision on these claims.[5] Lodgment 6. This Court, therefore, will refer to that opinion in reviewing Petitioner's claims.

**A.   Consolidation of the Two Cases**

In his first claim for relief, Petitioner contends that the trial court abused its discretion when it granted the prosecution's motion to consolidate the two cases against him. Pet'r Brief at 4-5. Specifically, Petitioner argues that the trial court failed to consider the prejudicial effect of joining a strong case with a much weaker case and of allowing inflammatory evidence from one case to be presented in the other. <u>Id.</u> at 5. Though Petitioner makes reference to the fact that this resulted in a due process violation, he cites only to

_____

[5]    The only exception is a portion of Claim Three relating to consecutive sentences. This claim will be reviewed in reference to the California Supreme Court's postcard denial of Petitioner's petition for review.

1    California cases and the California Constitution.  <u>Id.</u> at 4, 14-15.

2         As an initial matter, Respondent submits that because Petitioner

3    never fairly presented a federal claim for relief to the California

4    Supreme Court in regard to Claim One, the claim is unexhausted.  Resp't

5    Mem. at 14.    Alternatively, Respondent argues that Claim One is

6    procedurally  defaulted  because  state  law  likely  would  preclude

7    Petitioner from raising a claim for relief now that could have been

8    raised earlier on direct appeal.  <u>Id.</u> at 15.  Though Respondent submits

9    that the procedural hurdles bar relief, Respondent also contends that

10   Petitioner's claim fails on the merits.  <u>Id.</u> at 15-16.

11        1.  <u>**Exhaustion and Federal Question**</u>

12        Respondent is correct that Petitioner failed to exhaust his first

13   claim for relief.  Generally, the exhaustion of available state judicial

14   remedies is a prerequisite to a federal court's consideration of claims

15   presented in habeas corpus proceedings.  28 U.S.C. § 2254(b); <u>see</u> <u>Picard</u>

16   <u>v. Connor</u>, 404 U.S. 270, 275 (1971).   Exhaustion of a habeas

17   petitioner's federal claims requires that they have been "fairly

18   presented" in each appropriate state court, including a state supreme

19   court with powers of discretionary review, and that the petitioner

20   "alert[] [the state] court to the federal nature of the claim." <u>Baldwin</u>

21   <u>v. Reese</u>, 541 U.S. 27, 29 (2004).  Here, Petitioner did not cite to the

22   U.S. Constitution or federal law or in any way suggest that his due

23   process claim arises under federal law.  Lodgment 7 at 4-15.  To the

24   contrary, he expressly cited to the state constitution and to state law.

25   <u>Id.</u>  Therefore, the Court finds that Petitioner has not exhausted a

26   federal claim in regard to Claim One.[6]

27   _____

28        [6]    Respondent likely also is correct that Petitioner's claim is procedurally
     defaulted because California law generally precludes petitioners from raising claims
                                                                    (continued...)

1    Moreover, because Petitioner simply used a copy of his petition for
2  review as his federal petition, Petitioner also has not alleged a
3  federal claim before this Court.[7]  28 U.S.C. § 2254(a) (federal courts
4  may only address a petitioner's legal claim that the state courts'
5  adjudication "resulted in a decision that was contrary to, or involved
6  an unreasonable application of, clearly established Federal law, as
7  determined by the Supreme Court of the United States"); Estelle v
8  McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal
9  habeas court to reexamine state-court determinations on state-law
10  questions").

11    **2.   Merits Determination**

12    Nonetheless, the Court may deny an application for a writ of habeas
13  corpus on the merits, notwithstanding the failure to exhaust, if the
14  claim clearly lacks merit.  28 U.S.C. § 2254(b)(2); Cassett v. Stewart,
15  406 F.3d 614, 623-624 (9th Cir. 2005) (adopting the standard set forth
16  in Granberry v. Greer, 481 U.S. 129, 135 (1987) and holding that "a
17  federal court may deny an unexhausted petition on the merits only when
18  it is perfectly clear that the applicant does not raise even a colorable
19  federal claim").  In this case, Petitioner alleges that the two cases
20  against him were joined improperly.  Pet'r Brief at 4-14.  The Supreme

21

22    [6](...continued)
on collateral review that could have been raised earlier on direct appeal.  Ex Parte
23  Dixon, 41 Cal. 2d 756, 759 (1953).  However, the Court need not reach this issue in
light of the Court's finding that Claim One is unexhausted and, nonetheless, fails on
24  the merits.

25    [7]    Petitioner alleges a federal basis for this claim for the first time in his
Traverse, arguing that the trial court's consolidation of the two cases against him
26  violated his Fifth Amendment right to a fair trial.  Traverse at 4.  However, "[a]
Traverse is not the proper pleading to raise additional grounds for relief."  Cacoperdo
27  v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (finding that habeas claim presented
for the first time in a traverse was not properly raised in the district court).
28  Accordingly, Petitioner has failed to allege a federal claim in Claim One.

08cv1086-BEN (BLM)

1   Court has explained that:

2          ...all joint trials, whether of several codefendants or
    of one defendant charged with multiple offenses, furnish
3   inherent opportunities for unfairness when evidence submitted
    as to one crime (on which there may be an acquittal) may
4   influence the jury as to a totally different charge.  This
    type of prejudicial effect is acknowledged to inhere in
5   criminal practice, but it is justified on the grounds that
    (1) the jury is expected to follow instructions in limiting
6   this evidence to its proper function, and (2) the convenience
    of trying different crimes against the same person, and
7   connected crimes against different defendants, in the same
    trial is a valid governmental interest.

8

9   Spencer v. State of Texas, 385 U.S. 554, 562 (1967).  "Improper joinder

10  does not, in itself, violate the Constitution.  Rather, misjoinder would

11  rise to the level of a constitutional violation only if it results in

12  prejudice so great as to deny a defendant his Fifth Amendment right to

13  a fair trial."  U.S. v. Lane, 474 U.S. 438, 446 n.8 (1986).  Claims of

14  improper joinder thus are subject to harmless error review.  Id. at 449.

15  In other words, "an error involving misjoinder 'affects substantial

16  rights' and requires reversal only if the misjoinder results in actual

17  prejudice because it 'had substantial and injurious effect or influence

18  in determining the jury's verdict.'"  Id. at 446 (internal citations

19  omitted).

20         As previously discussed, it is not the province of this Court to

21  evaluate whether the Court of Appeal properly applied state law in

22  determining that it was proper to join the two cases against Petitioner.

23  Estelle, 502 U.S. at 67-68.  Thus, this Court looks only to the question

24  of whether, presuming the joinder was improper under state law[8],

25

26  ───────────────

27         [8]    The Court finds that the evidence in the record does not support the
    conclusion that the state court erred under California law.  The Court presumes error
28  only for purposes of determining whether Petitioner has made a sufficient showing of
    prejudice under federal law.

13                                              08cv1086-BEN (BLM)

Petitioner has shown that the alleged error resulted in prejudice so great as to deny him his Fifth Amendment right to a fair trial. <u>Lane</u>, 474 U.S. at 446 n.8. Petitioner argues that he was prejudiced by the joinder of a weak case (the one involving the January incident) with a stronger case (the one involving the February incident). Pet'r Brief at 13-14. In particular, Petitioner highlights that the pursuing officer in the January incident was not in a position to be able to identify the driver, whereas the pursuing officer in the February incident was able to clearly see the driver and later identify him in a photographic line-up. <u>Id.</u> at 13. Additionally, Petitioner argues that:

> [i]t is impossible to believe that the evidence of petitioner's relationship with an underage girl almost half his age along with the evidence of the pain and suffering she endured as a result of the accident did not serve to inflame and prejudice the jury against petitioner and cause them to return guilty verdicts on the much weaker case from January without independently evaluating the evidence in that case.

<u>Id.</u> For these reasons, Petitioner believes that the joinder resulted in undue prejudice. <u>Id.</u> at 14.

The Ninth Circuit has recognized that under some circumstances, the joinder of a weak case with a stronger case can taint the jury's consideration of the evidence in the weak case and result in unfair prejudice. <u>Bean v. Calderon</u>, 163 F.3d 1073, 1085 (9th Cir. 1998) (citing <u>Lucero v. Kerby</u>, 133 F.3d 1299, 1315 (10th Cir. 1998) ("Courts have recognized that the joinder of offenses in a single trial may be prejudicial when there is a great disparity in the amount of evidence underlying the joined offenses. One danger in joining offenses with a disparity of evidence is that the State may be joining a strong evidentiary case with a weaker one in the hope that an overlapping consideration of the evidence [will] lead to convictions on both.")).

However, the Supreme Court in <u>Lane</u> set forth several factors a court may consider in determining whether misjoinder has resulted in prejudice to the defendant, including the following: (1) whether overwhelming evidence of guilt was shown, (2) whether the trial court provided a "proper limiting instruction ... admonish[ing] the jury to consider each count and defendant separately," (3) the likelihood that evidence admitted on one count would have been admissible in a separate trial on the other count, and (4) whether the evidence as to one count was distinct and easily segregated from the evidence relating to the other count(s). <u>Lane</u>, 474 U.S. at 450 and n.13; <u>U.S. v. Jawara</u>, 474 F.3d 565, 579-580 (9th Cir. 2007).

In this case, the Court of Appeal found that Petitioner had not demonstrated any actual prejudice (Lodgment 6 at 16) and this Court finds that this conclusion is not contrary to clearly established federal law. As discussed in <u>Lane</u> factor two, the instant trial court instructed the jury to consider each count with which Petitioner was charged separately and return a separate verdict as to each count. Lodgment 2, vol. 3 at 559; <u>Penry v. Johnson</u>, 532 U.S. 782, 799 (2001) (generally, jurors are presumed to follow all of their instructions). The trial evidence also satisfied <u>Lane</u> factors three and four. As the Court of Appeal noted, "[b]ecause the evidence of the current evading crimes was substantially similar, the court could have found the circumstances of each of the crimes was cross-admissible on the issue of identity in each case as well as on the issue of intent in committing each crime." Lodgment 6 at 15 (citing <u>People v. Ewoldt</u>, 7 Cal. 4th 380, 402 (1994)). Though counsel ultimately stipulated in this case not to disclose to the jury that Petitioner had a prior conviction for reckless evasion of a peace officer, evidence of that prior conviction and

1  Petitioner's known fingerprints would have been cross-admissible as

2  well.  Id.  Additionally, because different police officers were

3  involved in the two separate incidents, and all involved officers

4  testified at trial, the evidence as to the January incident was distinct

5  and easily segregated from the evidence relating to the February

6  incident.  Lane, 474 U.S. at 450 and n.13; Jawara, 474 F.3d at 579-580.

7      Finally, with regard to the first Lane factor, the prosecution

8  presented strong evidence as to each case.  In order to prove that

9  Petitioner violated California Vehicle Code section 2800.2(a) ("Flight

10 from Pursuing Peace Officer - Reckless Driving"), the prosecution was

11 required to show:

12      One, a person, while operating a motor vehicle, willfully
        fled or otherwise attempted to elude a pursuing peace
13      officer; two, the person did so with the specific intent to
        evade that pursuing peace officer; three, the peace officer's
14      vehicle exhibited at least one lighted red lamp visible from
        the front; four, the person saw or reasonably should have
15      seen the red lamp; five, the peace officer's vehicle sounded
        a siren, as reasonably necessary; six, the peace officer's
16      motor vehicle was distinctively marked; seven, the peace
        officer's motor vehicle was operated by a peace officer
17      wearing a distinctive uniform; and, eight, the driver of the
        pursued vehicle drove the vehicle in a willful or wanton
18      disregard for the safety of persons or property.

19 Id. at 553 (instruction given to the jury).  Here, the record reflects

20 that the prosecution presented evidence showing that in both the January

21 and February incidents, a uniformed police officer in a marked patrol

22 car pulled up behind Petitioner, at which point Petitioner proceeded to

23 run red lights and stop signs and exceed the speed limit in residential

24 areas, while driving in an erratic pattern that could be construed as

25 willful and intentional attempts to evade a police officer, and then

26 abandoned the car and fled on foot.  The pursuing officers in both

27 incidents testified that they activated their lights and sirens while

28 in close proximity to Petitioner's car and that the equipment was

16

working.  In light of the foregoing, the Court finds that any misjoinder did not result in prejudice and the Court of Appeal's opinion was not contrary to <u>Lane</u>.

Nonetheless, Petitioner argues that the January case was weaker because the pursuing officer was unable to visually identify the driver (Petitioner does not challenge the identification made in regard to the February incident).  Pet'r Brief at 13.  However, the officer in the January case was able to identify the car, and the same vehicle was found minutes after the pursuit with Petitioner's state identification card lying on the floorboard of the driver's side.  Lodgment 6 at 5. Subsequent testing confirmed that a fingerprint found on the driver's side of the car belonged to Petitioner.  <u>Id.</u> at 6.  The only evidence offering an alternate explanation for these findings was Melissa Gomez's testimony that Petitioner had driven in that car to the casino with Gomez and her cousin.  Lodgment 2, vol. 1 at 114-15.  However, Ms. Gomez's credibility was drawn into question by the fact that she had some sort of romantic relationship with Petitioner.  <u>See id.</u> at 74, 78-9, 210.  In addition, Gina Alonzo, Ms. Gomez's cousin and the owner of the vehicle at issue, testified that Petitioner had never driven in her car with her to the casino.[9]  In his Traverse, Petitioner argues that Ms. Alonzo lied repeatedly and that he, in fact, had driven Alonzo's car repeatedly with her permission (which would explain the presence of his fingerprint on her car).  Traverse at 5.  He also asserts that Alonzo was charged with identity theft prior to Petitioner's trial, which he suggests explains why his California identification card and another

_____

[9]      Ms. Alonzo testified at the preliminary hearing and the transcript of that testimony was read into the record at trial.

woman's stolen credit card were found in Alonzo's car.  Id. at 5-6.  The

relevant factor in determining prejudice on federal habeas review,

however, is whether overwhelming evidence of guilt was shown, Lane, 474

U.S. at 450; Jawara, 474 F.3d at 579-580, not whether any other possible

argument exists.   As  discussed  above,  the  Court  finds  that  the

government did present overwhelming evidence of guilt.  Furthermore, the

explanation Petitioner proffers in his Traverse is unsupported by the

factual record before this Court (e.g. the record contains no evidence

of a pending identity theft charge against Alonzo).  Thus, this Court

finds that there was overwhelming evidence of guilt as to each incident,

Lane, 474 U.S. at 450 and Jawara, 474 F.3d at 579-580, and Petitioner,

therefore, has failed to demonstrate that he was prejudiced by the

joinder of the two cases.

     In sum, this Court finds that the Court of Appeal reasonably

concluded that the February incident case was not significantly stronger

than the January incident case and that Petitioner had failed to

demonstrate that he was prejudiced by the joinder of the two cases.

Accordingly, the Court finds that the Court of Appeal's decision was not

contrary to clearly established federal law and, therefore, **RECOMMENDS**

that Claim One be **DENIED**.

**B.   Admission of Allegedly Inflammatory and Irrelevant Testimony**

     In his second claim for relief, Petitioner contends that the trial

court abused its discretion in allowing the prosecutor to elicit

allegedly inflammatory and irrelevant testimony from Melissa Gomez about

her pregnancy and the fact that she lost the fetus as a result of the

accident.   Pet'r Brief at 16.

///

///

1        1.   **Exhaustion and Federal Question**

2       Whether Petitioner exhausted the federal basis for this claim is

3 a close question. Petitioner did not reference any federal

4 constitutional provisions or cite to any federal law. However,

5 Respondent seems to suggest that Petitioner's citation to People v.

6 Falsetta, 21 Cal. 4th 903, 913 (1999) suffices for exhaustion purposes

7 because Falsetta cites federal due process case law (specifically, to

8 Estelle and Spencer v. Texas, 385 U.S. 554, 562-64 (1967)). Resp't Mem.

9 at 16.

10     The Supreme Court has stated that a state prisoner does not "fairly

11 present" a claim for exhaustion purposes if the state court "must read

12 beyond a petition or a brief (or a similar document) that does not alert

13 it to the presence of a federal claim in order to find material, such

14 as a lower court opinion in the case, that does so." Baldwin v. Reese,

15 541 U.S. 27, 32 (2004). In the same opinion, the Court clarified that

16 "[a] litigant wishing to raise a federal issue can easily indicate the

17 federal law basis for his claim in a state-court petition or brief, for

18 example, by citing in conjunction with the claim the federal source of

19 law on which he relies or a case deciding such a claim on federal

20 grounds..." Id. It is unclear whether the Supreme Court intended to

21 include scenarios such as this where the case decided on federal grounds

22 was a state case and where the prisoner has provided no parenthetical

23 or other information alerting the reviewing court to the federal grounds

24 discussed in the cited case, though the Ninth Circuit has concluded that

25 such a practice is sufficient for exhaustion purposes. Peterson v.

26 Lampert, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc) ("for purposes

27 of exhaustion, a citation to a state case analyzing a federal

28 constitutional issue serves the same purpose as a cite to a federal case

analyzing such an issue"). This holding is limited, however, in that the Ninth Circuit has further held that if the cited state decision deals with both state and federal issues relevant to the claim, the federal issue is not "fairly presented" unless the citation is accompanied by a signal in the text of the brief indicating that the case involves federal issues. <u>Casey v. Moore</u>, 386 F.3d 896, 912 n.13 (9th Cir. 2004).

In this case, the pinpoint cite provided by Petitioner directs the court to a page discussing primarily federal due process law, though the case goes on to discuss both state and federal law. <u>See</u> <u>Falsetta</u>, 21 Cal. 4th at 913. The citation is not followed by any parenthetical explaining the federal analysis set forth in the state case or in any way bringing to the state court's attention the federal nature of the claim. Further, given that counsel prepared the state petition for review for Petitioner, there is no basis for reviewing the briefing under the more lenient standard afforded to *pro se* filings. <u>See</u> <u>Davis</u> <u>v. Silva</u>, 511 F.3d 1005, 1009 (9th Cir. 2008) (reiterating Supreme Court's holdings that the complete exhaustion requirement is not intended to trap unwary *pro se* prisoners and that *pro se* pleadings should be held to a less stringent standard than briefs by counsel). Nonetheless, under the Ninth Circuit's broad interpretation of Supreme Court precedent in this area, the Court finds that Petitioner's second claim for relief is exhausted. <u>Peterson</u>, 319 F.3d at 1158.

A finding that Petitioner alleged a federal claim before this Court requires a similar stretch of logic since, again, Petitioner simply used a copy of his petition for review as his federal petition. <u>See</u> 28 U.S.C. § 2254(a) (federal courts may only address a petitioner's legal claim that the state courts' adjudication "resulted in a decision that

was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"); <u>Estelle</u>, 502 U.S. at 67-68 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). However, applying the same, lenient Ninth Circuit law, the Court finds Petitioner has alleged a federal claim.

**2.   <u>Merits</u>**

Assuming Petitioner presented a properly-exhausted federal claim, the claim still fails on the merits. Petitioner objects to the trial court's admission of evidence regarding Melissa Gomez's lost pregnancy. Pet'r Brief at 16-17.

The Court of Appeal provided the following background on the issue:

Near the end of the prosecutor's direct examination of Gomez, he asked to go sidebar to discuss several questions he wanted to ask her. The prosecutor had learned from Gomez's medical records and the police report that she was pregnant when she was hit by traffic after the crash and had lost the fetus in the early stages of pregnancy. The prosecutor wanted to ask Gomez whether she was pregnant with Flores's child at the time.

When Flores's counsel objected on "relevance grounds," the prosecutor explained that because Gomez's demeanor was combative to his questioning and sympathetic toward Flores, the fact she was pregnant with his child would show she had an intimate relationship with him and was "a possible reason why she would have an attachment to him and seek to protect him at trial."

The trial court agreed that because Gomez had not been clear as to their relationship, the prosecutor could ask such questions for the limited purposes of credibility. When the court then asked whether the prosecutor had any proof if Gomez denied that the baby was Flores's, the prosecutor agreed with Flores's counsel that there was no evidence in the file that indicated the child had been Flores's. Nonetheless, the court told the prosecutor he could ask the question, but reminded him not to go into too much detail.

After the court advised the jury that it was permitting some questions for the limited purpose of credibility, the prosecutor asked whether Gomez had learned she were (sic) pregnant at the time she was hit by the car. When she said

21

08cv1086-BEN (BLM)

1
2
3
4

> she did not lose the fetus at that time, the prosecutor had
> her clarify that she had no child at the time of trial.  On
> cross-examination, Gomez said she lost the fetus during
> treatment for her leg injuries after the accident.  During
> jury instructions, the court again reminded the jurors as to
> the limited admissibility of such testimony concerning
> credibility of a witness.

5 Lodgment 6 at 16-17.  Because the record contained no evidence that

6 Flores was the father, the Court of Appeal concluded that the above

7 evidence was irrelevant and the trial court abused its discretion in

8 admitting it.[10]  Id. at 18-19.  However, the Court of Appeal determined

9 that the error was harmless under Chapman v. California, 386 U.S. 18,

10 23-24 (1967).  Id. at 19.

11      Even if the Court assumes that state court's admission of the

12 pregnancy evidence violated due process, see Jammal v. Van de Kamp, 926

13 F.2d 918, 920 (9th Cir. 1991) (erroneous admission of evidence violates

14 due process "[o]nly if there are no permissible inferences the jury may

15 draw from the evidence"), Petitioner is not entitled to habeas relief

16 unless the error "had substantial and injurious effect or influence in

17 determining the jury's verdict," Brecht v. Abrahamson, 507 U.S. 619, 623

18 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946);

19 see also Fry v. Pliler, 551 U.S. 112, __, 127 S.Ct. 2321, 2328 (2007)

20 (holding that the Brecht standard applies whether or not the state court

21 recognized the error and reviewed it for harmlessness).  In this case,

22 as the Court of Appeal discussed and this Court explained supra, the

23 government presented strong evidence that Petitioner recklessly evaded

24 police in the February incident.  Lodgment 6 at 19.  Officer Howard

25 confirmed in testimony that he identified Petitioner as the driver,

26

27          [10]   The Court of Appeal did not address Petitioner's allegation that the
28 evidence was also inflammatory because Petitioner did not object on that basis at
trial.  Lodgment 6 at 19 n.11.

several sources of evidence showed that Petitioner previously had been seen driving the car that was driven that night, Petitioner's fingerprint was found on the car, and the evidence further showed that Petitioner drove the car recklessly and evaded officers before crashing and fleeing from the scene. <u>Id.</u> at 7-9, 19. As such, even if the prejudicial evidence regarding Gomez's lost pregnancy had not been admitted, the jury still had sufficient evidence of Petitioner's guilt to find him guilty beyond a reasonable doubt.

Additionally, the Court of Appeal reasonably concluded that in light of the other evidence from and about Gomez that was presented during the case, it was not reasonably probable that Petitioner would have obtained a more favorable outcome had the evidence about Gomez's pregnancy not been admitted. <u>Id.</u> The photo strip of Gomez kissing Petitioner, coupled with her brother's and mother's testimony that they had a relationship, provided independent evidence that Gomez had a dating relationship with Petitioner (as did the fact that Petitioner was apprehended wearing a necklace with Gomez's name on it). <u>Id.</u> Gomez's reluctance to testify against Petitioner demonstrated a certain bias towards him, which the pregnancy evidence may have reinforced, but did not create.

Finally, the trial court admonished the jury both before and after the pregnancy evidence was presented that it was to consider this information only for the limited purpose of assessing Gomez's credibility. As a general rule, the court may presume that jurors followed the trial court's instructions. <u>See</u> <u>Kansas v. Marsh</u>, 548 U.S. 163, 179 (2006); <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); <u>Gibson v. Ortiz</u>, 387 F.3d 812, 822 (9th Cir. 2004).

08cv1086-BEN (BLM)

1    Given all of the foregoing, there is no basis for finding that the

2  challenged evidence had a substantial and injurious impact on the jury's

3  verdict.  See Fry, 127 S.Ct. at 2328; Brecht, 507 U.S. at 638.  Because

4  this Court finds that the Court of Appeal's decision was not contrary

5  to Brecht, the Court **RECOMMENDS** that Petitioner's second claim for

6  relief be **DENIED**.

7  **C.  Sentencing Issues**

8    In his final claim for relief, Petitioner argues that the trial

9  court's imposition of an aggravated sentence on count one and

10 consecutive sentences in counts three and five without first affording

11 Petitioner a jury trial on the existence of aggravating factors was

12 error under Cunningham v. California, 549 U.S. 270 (2007).  Pet'r Brief

13 at 18-39.

14    Respondent counters first that Petitioner's allegation regarding

15 his upper term sentence is foreclosed by Butler v. Curry, 528 F.3d 624

16 (9th Cir. 2008).  Resp't Mem. at 24.  In regard to Petitioner's claim

17 regarding the consecutive sentences, Respondent notes that because

18 Petitioner raised this claim for the first time in his petition for

19 review by the California Supreme Court, there is no reasoned state

20 decision addressing this claim.  Id.  Respondent, therefore, argues that

21 this portion of the claim is unexhausted because an issue is not fairly

22 presented if it arises for the first time in a petition for

23 discretionary review to the state's highest court.  Id. (citing Casey

24 v. Moore, 386 F.3d 896 (9th Cir. 2004)).  Nonetheless, Respondent argues

25 that the consecutive sentences claim should be denied because it lacks

26 merit.  Id. at 24-25.

27 ///

28 ///

24

1    **1.   Exhaustion**

2        As an initial matter, this Court disagrees that the portion of

3    Petitioner's claim relating to consecutive sentencing is unexhausted

4    because Petitioner raised it for the first time in his petition for

5    review by the California Supreme Court.  While the United States Supreme

6    Court has stated that a claim is not fairly presented "where the claim

7    has been presented for the first and only time in a procedural context

8    in which its merits will not be considered unless 'there are special and

9    important reasons therefor,'" Castille v. Peoples, 489 U.S. 346, 351

10   (1989), the effect of such a failure to fairly present a claim to the

11   Court of Appeal would be imposition of a procedural bar in the

12   California Supreme Court.  However, where the California Supreme Court

13   has not expressly specified that it did, in fact, impose such a bar,

14   this Court cannot conclude that the California Supreme Court did not

15   decide Petitioner's claim on the merits.  The Ninth Circuit made this

16   clear in Harris v. Superior Court, 500 F.2d 1124, 1128-29 (9th Cir.

17   1974) (en banc) and the court repeatedly has confirmed the Harris

18   holding, explaining:

19       Harris involved a so-called "postcard denial" from the
         California Supreme Court.  We held in that case that the
20       state court's denial of a habeas petition on procedural
         grounds did not exhaust state remedies, but that the state
21       court's denial of a habeas petition on the merits did exhaust
         state remedies.  We construed a bare postcard denial from the
22       California Supreme Court as a decision on the merits, for
         purposes of the exhaustion requirement, unless that court
23       expressly relied on a procedural bar.  In other words,
         although the state supreme court's response was ambiguous, we
24       adopted a plausible construction that it acted on the merits
         of a claim presented to it.  We have not overruled Harris.
25

26   Chambers v. McDaniel, 2008 WL 5143011, *5-*6 (9th Cir. Dec. 9, 2008)

27   (quoting Greene v. Lambert, 288 F.3d 1081, 1087 (9th Cir. 2002)

28   (internal citations omitted)); see Hunter v. Aispuro, 982 F.2d 344, 347-

48 & n.2 (9th Cir. 1992) (holding that a "bare postcard denial" by the California Supreme Court is ambiguous, and therefore, that a plausible construction of such an order is that it was a decision on the merits). Most recently, the Ninth Circuit expressly confirmed that "unless a court expressly (not implicitly) states that it is relying upon a procedural bar, we must construe an ambiguous state court response as acting on the merits of a claim, if such a construction is plausible" and that, therefore, "where the California Supreme Court includes no citation and simply states that the petition is denied, that absence of a citation coupled with the cursory statement denying the petition satisfies the exhaustion requirement." <u>Chambers</u>, 2008 WL 5143011 at *6.

In light of this precedent, the Court finds that Petitioner's claim pertaining to consecutive sentences is exhausted.

**2.   <u>Upper Term Sentence on Count One</u>**

Petitioner's claim relates to California's determinate sentencing scheme, under which the statute defining each offense prescribes three precise terms of imprisonment-a lower, middle, and upper term sentence. <u>Cunningham</u>, 549 U.S. at 277.  California law directs the trial court to impose the middle term unless circumstances in aggravation or mitigation exist.  <u>Id.</u>  The fact that a defendant has one or more prior convictions is often considered as a circumstance in aggravation.

Over the past decade, the Supreme Court repeatedly has addressed which facts related to sentencing must be determined by a jury in order to satisfy the requirements of the Sixth Amendment.  In <u>Almendarez-Torres v. United States</u>, 523 U.S. 224 (1998), the Supreme Court determined that the fact of a prior conviction for an aggravated felony need not be pled in an indictment or proved to a jury beyond a reasonable doubt.  Building on that holding, the Court in <u>Apprendi v.</u>

*New Jersey*, 530 U.S. 466 (2000) held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The Supreme Court subsequently defined the "statutory maximum" for each individual crime as "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Blakely v. Washington*, 540 U.S. 296, 303 (2004) (emphasis in original). Finally, in Cunningham, the Supreme Court concluded that under California's determinate sentencing scheme, the middle term is the statutory maximum. *Cunningham*, 549 U.S. at 288.

Petitioner argues that the trial court's imposition of an upper term sentence on count one without first affording him a jury trial on the existence of recidivism-related factors in aggravation violated *Cunningham*. Pet'r Brief at 18. More precisely, Petitioner submits that *Almendarez-Torres* is no longer valid in light of *Apprendi*, *Blakely* and *Cunningham*. *Id.* at 19.

However, Petitioner's claim must fail because while some members of the Supreme Court have called into question the continued validity of *Almendarez-Torres*, it has never been overruled. *See Butler v. Curry*, 528 F.3d 624, 643 (9th Cir. 2008). In other words, because the Supreme Court continues to hold that "*[o]ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," *Apprendi*, 530 U.S. at 490 (emphasis added), the Ninth Circuit has instructed that lower courts have an obligation to continue to apply the *Almendarez-Torres* exception. *Butler*, 528 F.3d at 643-44. In Petitioner's case, the sentencing court based the upper

1  term conviction for count one on the fact that Petitioner had no

2  circumstances in mitigation and at least two circumstances[11] in

3  aggravation, including "numerous" prior convictions.  Lodgment 6 at 20-

4  1; Lodgment 2, vol. 4 at 716.  As clearly established Supreme Court

5  precedent currently stands, it is neither a violation of the Sixth

6  Amendment nor Cunningham for a judge to impose an upper term sentence

7  based on a prior conviction without jury fact-finding.  Apprendi, 530

8  U.S. at 490; Cunningham, 549 U.S. at 288; Butler, 528 F.3d at 643.[12]

9       The Court, therefore, concludes that the Court of Appeal's decision

10 rejecting Petitioner's Cunningham claim was not contrary to, or an

11 unreasonable application of, clearly established Supreme Court law and

12 **RECOMMENDS** that this claim for relief be **DENIED**.

13 ///

14 ///

15

16      [11]    In imposing the upper term, the trial judge found the following two
circumstances in aggravation: (1) that Petitioner had numerous prior convictions as an
17 adult and (2) that Petitioner's prior performance on probation overall was
unsatisfactory.  See Lodgment 2, vol. 4 at 716.  It is undisputed that the jury did not
18 find the facts establishing either aggravating circumstance.  Accordingly, the poor
probation performance may not justify the imposition of the upper term.  However, as
19 set forth in the body of this report and recommendation, the prior convictions do
support the upper term sentence.  "[I]f at least one aggravating factor on which the
20 judge relied in sentencing [Petitioner] was established in a manner consistent with the
Sixth Amendment, [the] sentence does not violate the Constitution."  Butler, 528 F.3d
21 at 643; see also People v. Black, 41 Cal. 4th 799, 813 (2007) ("Black II") (as long as
a single aggravating circumstance is established in accordance with Apprendi and its
22 progeny, additional improper judicial fact-finding does not render the resulting
sentence unconstitutional).  Petitioner's upper-term sentence does not violate the
23 Constitution.

24      [12]    Butler announced a three part test to be utilized in determining the scope
and applicability of the Almendarez-Torres exception.  Butler, 528 F.3d at 645.  While
25 it is unclear whether the new Butler test governs the instant petition, it is clear
that the facts of the instant case satisfy the Butler test.  Here, the sentencing judge
26 only relied on the "fact of a prior conviction" in imposing the upper term sentence.
Lodgment 6 at 20-1; Lodgment 2, vol. 4 at 716.  The judge did not consider any other
27 facts related to the prior conviction.  Id.  Accordingly, the imposition of the upper
term sentence based on Petitioner's prior conviction(s) satisfies the Butler test,
28 invokes the Almendarez-Torres exception, and is constitutional.

08cv1086-BEN (BLM)

3.  **Consecutive Sentences on Counts 3 and 5**

Petitioner contends that, under Cunningham, he had the right to a jury trial to determine the existence of the facts relied upon by the trial court in reaching its decision to impose consecutive sentences on counts 3 and 5 under California Penal Code § 667.6(c).  Pet'r Brief at 18, 24-5.  Petitioner's claim lacks merit.

At the time the California Supreme Court issued its postcard denial of Petitioner's claim regarding the imposition of consecutive sentences, the court's ruling was not contrary to, or an unreasonable application of, clearly established Supreme Court authority because no Supreme Court case had yet squarely addressed the issue of whether the Sixth Amendment requires that facts (other than prior convictions) necessary to impose consecutive sentences be found by the jury or admitted by the defendant. The Supreme Court's holdings in Apprendi and its progeny do not address a defendant's Sixth Amendment jury trial right as applied to the judge's authority to impose consecutive sentences.[13]  Accordingly, Petitioner's claim fails under the law as it stood at the time of his sentencing and at the time of the California Supreme Court's subsequent review.

Since that time, the United States Supreme Court has addressed the issue and squarely rejected the argument that "the Sixth Amendment mandate[s] jury determination of any fact declared necessary to the

---

[13]    Notably, the California Supreme Court reached the same conclusion in Black II when it reviewed its prior decision in People v. Black, 35 Cal. 4th 1238 (2005) ("Black I") in view of Cunningham.  The Black II court held that "Cunningham ... does not undermine our previous conclusion [in Black I] that imposition of consecutive terms under [Penal Code] section 669 does not implicate a defendant's Sixth Amendment rights."  Black II, 41 Cal. 4th at 821.  While Petitioner in this case claims to have been sentenced under Penal Code § 667.6(c), it is unclear from the record whether the trial court actually applied this section (as it appears inapplicable).  Regardless, nothing in Black II suggests that its holding would be any less applicable to Petitioner's case even if he were sentenced under a different provision than Black.

1  imposition of consecutive, in lieu of concurrent, sentences." <u>Oregon</u>
2  <u>v. Ice</u>, __ U.S. __, 2009 WL 77896, *3 (Jan. 14, 2009).  As the Supreme
3  Court explained:

4          The decision to impose sentences consecutively is not within
       the jury function that "extends down centuries into the
5       common law." <u>Apprendi</u>, 530 U.S., at 477, 120 S.Ct. 2348.
       Instead, specification of the regime for administering
6       multiple sentences has long been considered the prerogative
       of state legislatures.
7
8  <u>Id.</u> at *5.  Because the determination of how to administer multiple
9  sentences, unlike the evaluation of facts justifying imposition of an
10 upper term sentence, has never been a jury function, the Supreme Court
11 further found that <u>Cunningham</u> does not apply to the consecutive
12 sentencing issue.  <u>Id.</u> at *6.

13      In sum, because the California Supreme Court's decision was neither
14 contrary to, nor an unreasonable application of, clearly established
15 Supreme Court precedent, this Court **RECOMMENDS** that Petitioner's final
16 claim for relief be **DENIED**.

17              <u>**CONCLUSION AND RECOMMENDATION**</u>

18      In sum, this Court finds that Petitioner has failed to establish
19 that the California state courts' decisions as to his claims were
20 contrary to, or unreasonable applications of, clearly established
21 federal law.  <u>See</u> 28 U.S.C. § 2254(d).  Nor has Petitioner made any
22 persuasive argument that further factual development is necessary, such
23 that an evidentiary hearing would be warranted.  <u>See</u> 28 U.S.C.
24 § 2254(e)(2) (exceptions where an evidentiary hearing may be
25 appropriate).  As such, this Court **RECOMMENDS** that Petitioner's Petition
26 for Writ of Habeas Corpus be **DENIED** and the case dismissed with
27 prejudice.
28 ///

1      For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the

2 District Court issue an Order: (1) approving and adopting this Report

3 and Recommendation, and (2) directing that Judgment be entered denying

4 the Petition.

5      **IT IS HEREBY ORDERED** that any written objections to this Report

6 must be filed with the Court and served on all parties **no later than**

7 **March 6, 2009.**  The document should be captioned "Objections to Report

8 and Recommendation."

9      **IT IS FURTHER ORDERED** that any reply to the objections shall be

10 filed with the Court and served on all parties **no later than <u>March 27,</u>**

11 **<u>2009</u>**.  The parties are advised that failure to file objections within

12 the specified time may waive the right to raise those objections on

13 appeal of the Court's order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455

14 (9th Cir. 1998).

15 DATED:  February 12, 2009

16

17                BARBARA L. MAJOR
               United States Magistrate Judge

18

19

20

21

22

23

24

25

26

27

28

08cv1086-BEN (BLM)